**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| EDWARD FLYNN, derivatively on behalf of COGENT COMMUNICATIONS HOLDINGS, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>DAVID SCHAEFFER, PAUL DE SA, STEVEN BROOKS, SHERYL KENNEDY, MARC MONTAGER, LEWIS H. FERGUSON III, DENEEN HOWELL, EVE HOWARD, DAVID BLAKE BATH, AND THADDEUS G. WEED,<br><br>Defendants,<br><br>-and-<br><br>COGENT COMMUNICATIONS HOLDINGS, INC., a Delaware Corporation,<br><br>Nominal Defendant. | Case No.<br><br>PLAINTIFF'S VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT |

Plaintiff Edward Flynn ("Plaintiff"), derivatively on behalf of Cogent Communications Holdings, Inc. ("Cogent" or the "Company"), brings the following complaint against the Company's board of directors (the "Board") and executive officers for breaches of fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, and violation of Section 14(a) of the Securities Exchange Act of 1934. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in the Complaint are based upon information and belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) pleadings filed in *City of Southfield Fire and Police Retirement System v. Cogent Communications Holdings, Inc., et al.*, No. 1:26-cv-02609 (D.D.C. filed July 23, 2026); (iii) corporate governance documents available on the Company's

website; (iv) media reports; and (v) other publicly available information.

## NATURE OF THE ACTION

1. This is a stockholder derivative action brought by Plaintiff, a stockholder of Cogent, on behalf of the Company against the Defendants. This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least February 29, 2024, to May 1, 2026 (the "Relevant Time Period"). During that time the Defendants (as defined herein) caused or allowed Cogent to issue or make materially false and misleading statements concerning the Company's financial condition and business operations.

2. The misconduct arose from Cogent's acquisition and integration of a wireline business and Defendants' repeated representations that the acquired business would support substantial growth through a new optical wavelength business. Defendants told investors that Cogent was experiencing strong demand, a growing backlog of wavelength orders, and sufficient financial strength to maintain its long-standing dividend policy. In reality, the Company's purported backlog and customer demand were materially overstated, the wavelength business was not performing as represented, and Cogent's ability to sustain its dividend and financial targets was far weaker than Defendants disclosed.

3. During the Relevant Time Period, Defendants caused Cogent to issue materially false and misleading statements concerning the strength of customer demand for Cogent's optical wavelength services, the size and quality of the Company's wavelength backlog, the expected revenue growth and profitability of the acquired wireline business, and Cogent's ability to maintain its long-standing dividend policy. Defendants repeatedly represented that Cogent's wavelength business was supported by a large and growing backlog of customer orders, that the Company was positioned to convert that backlog into meaningful revenue growth, and that Cogent had sufficient

financial strength to continue its dividend policy. These statements were false and misleading because Defendants failed to disclose that a substantial portion of the reported backlog was unlikely to become paying customer revenue, customer demand was weaker than represented, the wavelength business was not performing at the levels necessary to support Cogent's stated targets, and the Company's dividend policy was not sustainable under the circumstances.

4. The truth began to emerge when Cogent disclosed that the wavelength business was not converting its purported backlog into paying customer revenue at the rates Defendants had led investors to expect, that customers were delaying or declining acceptance of provisioned wavelengths, and that the Company could no longer support its prior representations concerning demand, growth, and dividend sustainability. As these facts were revealed, Cogent's stock price declined sharply, the Company was forced to substantially reduce its dividend, its reputation and goodwill were damaged, and it incurred and will continue to incur substantial costs, including costs associated with defending the related securities class action and implementing remedial measures to address governance, disclosure, and internal-control deficiencies.

5. Through this action, Plaintiff seeks to hold the Board and executive officers accountable for making or causing the Company to make false and misleading statements, as well as the inadequate internal controls that allowed the misconduct to occur, in breach of their fiduciary duties to the Company.

## PARTIES

### A. Plaintiff

6. Plaintiff Edward Flynn is a current shareholder of Cogent and has continuously held Cogent stock during all times relevant hereto and is committed to retaining Cogent shares

through the pendency of this action to preserve their standing. Plaintiff will adequately and fairly represent the interests of Cogent and its shareholders in enforcing its rights.

**B. Nominal Defendant**

7. Nominal Defendant Cogent is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 2450 N Street, NW, Washington, D.C. 20037. Cogent common stock trades on the NASDAQ Global Select Market under the ticker symbol "CCOI."

**C. Individual Defendants**

8. Defendant David Schaeffer is Cogent's founder and, during the Relevant Time Period, served as the Company's President, Chief Executive Officer, and a member of the Board.

9. Defendant Paul De Sa served as a director of the Company during the Relevant Time Period.

10. Defendant Steven Brooks served as a director of the Company during the Relevant Time Period.

11. Defendant Sheryl Kennedy served as a director of the Company during the Relevant Time Period.

12. Defendant Marc Montager served as a director of the Company during the Relevant Time Period.

13. Defendant Lewis H. Ferguson III served as a director of the Company during the Relevant Time Period.

14. Defendant Deneen Howell served as a director of the Company during the Relevant Time Period.

15. Defendant Eve Howard served as a director of the Company during the Relevant Time Period.

16. Defendant David Blake Bath served as a director of the Company during the Relevant Time Period until May 2025.

17. Defendants Schaeffer, De Sa, Brooks, Kennedy, Montager, Ferguson, Howell, Howard, and Bath are herein referred to as "Director Defendants."

18. Defendant Thaddeus G. Weed served as Cogent's Chief Financial Officer during the Relevant Time Period.

19. Defendants Schaeffer and Weed are herein referred to as "Officer Defendants."

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

21. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

23. Venue is proper in this court under 28 U.S.C. § 1391, because Cogent is headquartered in this District, and a significant amount of the conduct at issue took place and had an effect in this District.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A. Company Background

24. Cogent is one of the largest carriers of internet traffic in the world. The Company is a global facilities-based provider of low-cost, high-speed internet access, private network services, optical wavelength and transport services, and data center colocation space and power. Cogent currently services three customer bases: (i) corporate; (ii) net-centric; and (iii) enterprise.

25. The Company's corporate customers are located in multi-tenant office buildings that typically house professional services businesses, such as law firms, financial services firms, advertising and marketing firms, health care providers, and educational institutions.

26. The Company's net-centric customers include bandwidth-intensive users who leverage Cogent's network to either deliver content to end users (such as web hosting companies and commercial content providers) or to provide access to residential or commercial internet users (such as other internet service providers, mobile phone operators, and cable television companies).

27. Cogent's enterprise companies are large corporations, typically Fortune 500 companies with greater than $5 billion in annual revenue that run Wide Area Networks involving numerous sites. The Importance of Cogent's Long-Standing Dividend Policy

28. Cogent is a public company whose common stock trades on the NASDAQ under the ticker symbol "CCOI." During the Relevant Time Period and prior thereto, Cogent's quarterly dividend was a significant factor in attracting and retaining investors due to its high dividend yield (5.5% in 2024 and 9.2% during 2025) and consistent dividend growth. During the Relevant Time Period, Cogent and its executives highlighted the number of consecutive quarters the Company had increased its dividend. Ultimately, Cogent did so for 52 straight quarters – 13 consecutive

years – with the streak only snapping when the Company slashed its dividend by 98% during the Relevant Time Period.

29. On September 7, 2022, Cogent announced an agreement (which ultimately closed on May 1, 2023) to acquire T-Mobile's wireline business (the "Acquisition"). The Acquisition included T-Mobile's vast North American fiber network, hundreds of buildings and technical sites with significant power capacity, and a sizeable customer base including many large enterprise customers. The T-Mobile network acquired in the Acquisition by Cogent included approximately 19,000 long-haul route miles of fiber, 1,300 miles of metro fiber, and 16,800 route miles of leased dark fiber.

30. The wireline business was formerly part of Sprint prior to its merger with T-Mobile in 2020. Historically, the wireline business provided wireline communication services to domestic and international customers and supported the operation of Sprint's CDMA and LTE cellular networks. During the first half of 2022, T-Mobile retired Sprint's cellular networks and confirmed that T-Mobile was no longer relying on Sprint's network to support T-Mobile's wireless business. Shortly thereafter, T-Mobile and Cogent agreed to the Acquisition.

31. At the time the Acquisition was announced, T-Mobile's wireline business was losing money (with a negative 80% margin) and experiencing declining revenues of over 10% per year for the prior three years. The wireline business was in such dire straits that T-Mobile sold the business to Cogent for $1 (subject to certain adjustments for net debt and net working capital). To make the deal even more attractive to Cogent, T-Mobile also contracted to pay Cogent $700 million in "IP transit services" for the continued use of the network over the next 54 months, with $350 million of the amount to be paid during the first year (the "IP Transit Services Agreement").

32. Although the wireline business was unprofitable and deteriorating rapidly, Cogent claimed the deal offered the Company sufficient strategic, technical, and long-term financial benefits, including inter alia:

- An increased nationwide fiber network footprint that would be owned in fee simple rather than leased from third parties for finite terms;
- Entry into the North American market for high-margin optical wavelengths, then estimated at $2 billion annually and expected to grow at 7% per year for the next six years;
- Integration of Cogent's network with Sprint's wireline network, which would substantially expand Cogent's footprint;
- Network integration that would result in the elimination of redundant locations, many of which were leased;
- The acquisition of over 400 buildings and technical sites, over 40 of which could be repurposed as data center facilities to support Cogent's new wavelength business;
- The acquisition of legacy Sprint's customer base;
- The ability for the Acquisition to be accretive to EBITDA per share and cash flow per share over a multi-year period through additional revenues, cost synergies, operational efficiencies, and margin improvements; and
- The ability "to strengthen Cogent's commitment to sustaining its record of sequential dividend growth."

33. In sum, Cogent claimed the Acquisition would meaningfully bolster its business, as the Company would manage the decline of the existing wireline business by pruning unprofitable contracts while increasing operational efficiencies and repurposing acquired physical assets to meet emerging demands for high-margin optical wavelength and transport services, such

as from artificial intelligence ("AI") companies and data center businesses. In this way Cogent would transform itself from a pure-play internet service provider to one additionally offering high capacity, long-haul optical wavelength services along an expanded network footprint. The Success of Cogent's New Optical Wavelength Business Was Critical to Its Turnaround Plan for the Wireline Business and the Company's Overall Success.

34. Between the announcement of the Acquisition and its closing, Cogent provided financial guidance for its integrated operations that represented Cogent would materially improve its revenue growth and profitability within five years of the Acquisition's closing. Specifically, Cogent stated it was on track to achieve annual revenue growth of 5% to 7% accompanied by an aggregate revenue target of over $1.5 billion by mid-2028. After achieving initial synergies, EBITDA margin was purportedly on track to expand annually by about 100 basis points.

35. The lynchpin to achieving these new targets was Cogent's new optical wavelength business. Cogent repeatedly claimed that its new wavelength business would be an outsized contributor to growth. On November 3, 2022, for example, during the Company's third quarter 2022 earnings call, defendant Schaeffer set a $400 million annual run rate target for the business by mid-2028, stating:

> But the real meteoric growth in the combined business will come from our ability to sell the optical transport products or wavelengths. Today that is only an $8 million business [at Sprint] . . . . . . [W]e anticipate that within 5 years of closing, we can grow that to a $400 million business. So, when we add these 3 legs of growth together on a more normalized basis, getting past this initial ramp-up in the wavelength business, we should find the combined company with EBITDA margins in the low to mid-30s and the ability to grow topline 5% to 7% and the ability to expand margins consistently at about 100 basis points a year.

36. A year later, during the Company's third quarter 2023 earnings call on November 9, 2023, defendant Schaeffer increased Cogent's expectations for the business to an annual run rate of $500 million, stating:

> And then to go to answer your question around a 5-year target, and I'm going to use 5 years from closing. So May of '23 to May of '28. We anticipate being on a run rate for wavelength sales of approximately $500 million and a total run rate for the combined business in excess of $1.5 billion, up from the $1.1 billion of $1.150 billion, $1.2 billion that we're running at right now.

37. In the Company's annual report on Form 10-K for its fiscal year 2023 filed with the SEC on the first day of the Relevant Time Period (the "2023 Report"), the Company stated that most of this growth was to occur in its new wavelength business: Management intends to reduce the negative cash flow of the Sprint Business through the payments from the IP Transit Services Agreement, reducing operating costs and increasing revenue primarily by providing optical wavelength and optical transport services over our fiber network, including the owned network we acquired with the Sprint Business.

38. Shortly after the Acquisition's announcement, Cogent reported a gross leverage ratio of 5.31x and a net leverage ratio of 3.93x as of September 30, 2022, with total debt of approximately $1.24 billion and net debt of $914 million against trailing 12-month adjusted EBITDA of about $233 million. As of March 31, 2023 (the quarter prior to the Acquisition's closing), Cogent reported increased gross leverage of 5.47x and increased net leverage of 4.46x, with total debt of approximately $1.27 billion and net debt of $1.04 billion. Cogent defined gross leverage ratio as total debt divided by the trailing last 12 months EBITDA, as adjusted for Sprint acquisition costs. Cogent defined net leverage ratio as total net debt (total debt minus cash and cash equivalents) divided by the trailing last 12 months EBITDA, as adjusted for Sprint acquisition costs. Given Cogent's leverage, defendants were keenly aware the Company had limited margin for error and required its new optical wavelength business to succeed to preserve its credit rating and to maintain its longstanding dividend policy.

39. Defendant Schaeffer was personally highly leveraged and highly dependent on the price of Cogent shares. Defendant Schaeffer's personal finances rendered him uniquely dependent on the price of Cogent shares. Defendant Schaeffer had not received a salary since 2015. Instead of cash, defendant Schaeffer's compensation was almost entirely in the form of Company stock awards that did not vest for years. In 2024, for instance, defendant Schaeffer received a total compensation package worth approximately $12.7 million. The cash component for the year was approximately $186,000, which came from a special incentive award linked to the Company's optical wavelength sales. The remaining 98% of his compensation came in the form of restricted stock awards ("RSAs") that had a total grant date value of approximately $12.5 million and were split about equally between time-based RSAs and performance-based RSAs. The time-based RSAs included 84,000 shares that vested in 12 equal monthly increments starting on January 1, 2027. The performance-based RSAs of up to 96,000 shares were eligible to vest on April 1, 2027, based on certain multi-year (2024-2026) performance metrics, half of which were tied to Cogent's annual EBITDA growth rate and half of which were tied to Cogent's total shareholder return. All awards were earned or vested no earlier than 36 months from the grant date.

40. Relatedly, defendant Schaeffer's personal fortune largely consisted of two main assets: (i) Cogent stock (he owned approximately 10% of the Company as of February 28, 2024); and (ii) a substantial commercial real estate portfolio consisting mostly of Washington, D.C.-area office buildings. Over time these two asset classes became inextricably intertwined, as defendant Schaeffer pledged many of the Cogent shares he owned as collateral for margin loans that supported his real estate portfolio and covered the taxes on stock awards from Cogent. As a result, defendant Schaeffer had positioned his personal fortune to be vulnerable to significant declines in the price of Cogent shares.

41. When the COVID-19 pandemic hit, demand for office space plummeted and caused the value of defendant Schaeffer's portfolio to decline rapidly, with the total value of his portfolio dropping from approximately $1.1 billion in 2022 to $500 million by mid-2025 – a $600 million loss. Defendant Schaeffer later recounted: "I had a stable portfolio that was consistently appreciating. And then when Covid hit, the portfolio began to depreciate . . . The DOGE overhang and the additional pressure that put on the entire market turned the D.C. market from one of the best into one of the worst markets nationally."

42. When the price of Cogent shares declined precipitously in 2025, defendant Schaeffer faced a margin call he could not meet; and, in August 2025, lenders at JPMorgan Chase & Co. and Royal Bank of Canada seized and promptly sold $82.5 million worth of his Cogent stock. By the end of 2025, Schaeffer had to sell 84% of his stake in Cogent, reducing his ownership in the Company from 10% to 1.5%, in addition to forfeiting his interests in several buildings due to defaults.

43. Defendants fraudulently misrepresented demand for Cogent's acquired wireline business in order to boost the price of Cogent stock. Cogent's turnaround plan for the wireline business was a costly and time consuming endeavor, requiring tens of millions of dollars of investment by the Company for improvements in network reconfiguration, facility conversions, and optimizations that were designed to enable wavelength sales with improved "provisioning" times (which Cogent hoped to reduce from 120+ days to 14 days). In order for the Acquisition to be successful, and ultimately accretive to Cogent's earnings, the Company needed to add thousands of paying customers to the acquired network.

44. During the Relevant Time Period, defendants represented that demand for optical wavelengths in Cogent's newly acquired wireline business was exceptionally strong and rapidly

growing. For example, in February 2024, defendant Schaeffer told investors that "[t]he backlog has more than doubled sequentially in the [fourth] quarter [of 2023]." He continued: "So on the third quarter earnings call, our backlog was approximately a thousand orders in the sales funnel and provisioning funnel that number is up to approximately 2,300." Similarly, in August 2024, defendant Schaeffer stated: "We have a significant backlog and funnel of wave opportunities, representing over 2,700 unique wavelengths." A company's "backlog" refers to sales orders or indications that remain to be completed. The robust and rising backlog Cogent claimed to be experiencing during the Relevant Time Period therefore indicated strong customer demand, growing sales, and robust future expected revenue. These and similar comments by defendants reassured investors about the purported financial benefits of the Acquisition, driving the price of Cogent stock to a Class Period high of over $86 per share by November 2024.

45. Defendant Schaeffer took millions of dollars' worth of loans backed by his substantial Cogent shareholdings. With these loans, defendant Schaeffer had built extensive real estate holdings and an investment portfolio centered in the D.C. metro area. While allowing defendant Schaeffer to amass personal wealth, the share pledges placed intense pressure on defendant Schaeffer to maintain or increase the price of Cogent shares. If the price of Cogent stock fell significantly, defendant Schaeffer risked a margin call that could require him to quickly sell large amounts of Cogent stock, thereby driving down the price of Cogent stock and causing his wealth to drop.

46. Cogent's SEC filings recognized the risk posed to investors by defendant Schaeffer's pledging activities, stating that "a pledge of a significant number of shares of the Company's stock poses a risk to the Company and its other stockholders should a lender foreclose on the pledged shares and sell all or a significant portion of them in a manner that disrupts the

market for the shares." To mitigate this risk, the Audit Committee of Cogent's Board of Directors purportedly reviewed defendant Schaeffer's pledging obligations quarterly and underwent extensive due diligence to evaluate his real estate holdings. The Board of Directors also set various purported limits on defendant Schaeffer's pledging behavior, including a pre-approval process that ostensibly: (i) disallowed more than 5% of the Company's outstanding shares, on a fully diluted basis, to be pledged at any one time absent exceptional circumstances; (ii) disallowed an executive from pledging more than 50% of their personal Cogent holdings absent exceptional circumstances; (iii) considered the amount and type of other assets securing the full recourse loan; and (iv) considered amount of the loan relative to the financial condition of the individual. Applying these and other relevant factors, the Audit Committee added to the already substantial risk created by defendant Schaeffer's pledging activities by allowing him to exceed the numerical limits set by the Company's pledging policy, telling investors "there was not a material risk that he could be forced to sell Cogent shares involuntarily."

47. Unbeknownst to investors, however, the order backlog that defendants routinely publicized during the Relevant Time Period was, by and large, illusory – a fact later confirmed when most of the purported backlog never turned into paying customers even after the Company's network had been fully repurposed. Not only have the Company and its executives subsequently admitted to losing up to 90% of the purported backlog, they have also admitted that this extraordinary loss was largely "expected." The harm to investors once the truth was revealed was magnified by defendant Schaeffer's highly risky pledging activities, as was reasonably foreseeable and well-within the predictable zone of risk created by defendants' fraudulent scheme, forcing a fire sale of vast quantities of Cogent stock as a result of lender margin calls on defendant Schaeffer's loans.

48. Based on defendants' false and misleading statements to investors about Cogent's backlog, customer demand, and the Company's ability to maintain its dividend policy, Cogent's stock price reached a high of more than $86 per share only to fall to less than $17 per share in the days following the end of the Relevant Time Period, a decline of more than 80%. The precipitous decline in the price of Cogent stock as a result of the fraudulent scheme and course of business detailed herein has inflicted substantial economic harm on plaintiff and other members of the Class.

**B. Cogent's False and Misleading Statements**

49. From at least February 29, 2024 through May 1, 2926, Cogent and its executive officers made materially false and misleading statements about Cogent's backlog, customer demand, and the Company's ability to maintain its dividend policy.

50. On February 29, 2024, Cogent issued a release announcing its fourth quarter 2023 ("4Q23") and year-end 2023 ("FY23") financial results.

51. The Company also held an earnings call that day to discuss its 4Q23 and FY23 results. On the call, defendant Schaeffer highlighted the Company's significant backlog of optical wavelength orders while discussing the Company's progress in building out its optical wavelength network, stating:

> As of today, we are selling wavelength services in 65 carrier neutral data centers. With expended provisioning cycles, we can also sell wavelengths and an additional 285 carrier neutral data centers or a total of 360 facilities across North America. We're generating $3.3 million of revenue from wavelength sales in the previous quarter with 667 discreet installed wavelengths.
>
> We have a significant funnel of wavelength orders in the pipeline. Today, we have a combination of orders signed as well as in our sales funnel of over 2,300 orders.

52. When asked about the Company's decision not to break out wavelength sales in the Company's release and the Company's prior statement that wavelength sales would probably be

around $20 million per quarter by mid-year, defendant Schaeffer highlighted the purported doubling of the Company's "backlog" of customer orders for its optical wavelength business, stating:

> So the decision on just not including it in the press release was so we would have a more fulsome opportunity to discuss it in the prepared remarks as we did. I think it is important to be able to disclose both the revenue run rate which was $3.3 million up sequentially and the unit count which was 667. We are still hampered by the number of sites that we can provision. The backlog has more than doubled sequentially in the quarter.
>
> So on the third quarter earnings call, our backlog was approximately a thousand orders in the sales funnel and provisioning funnel that number is up to approximately 2,300. We actually anticipate, based on information from the sales force and our conversations with customers, that we're going to continue to see an acceleration in the order value. We are frustrated by the amount of time it's take to [wave] enable sites.
>
> We are still confident by year end that we will be able to have 800 sites that can provision waves with a kind of two-week average provisioning window. We are definitely not there today. As a result, we will probably not be on a run rate by mid-year of $20 million of installed business. I think we will have a funnel that will demonstrate that, but the sheer number of sites that need to be touched and the number of steps that have to be done to convert the former Sprint voice network into a wavelength optimized network is a very daunting task. We are progressing well.
>
> There are over a thousand of our 2000 employees who are almost completely full-time focused on this effort. We absolutely will meet the year end targets, but I think by mid-year the funnel will demonstrate that run rate, but it probably will not be provisioned due to these extended provisioning windows in those 285 sites.

53. When asked whether he thought Cogent would be able to get through "that 2,300-order backlog by the end of the year" or whether the Company was "finding any customers finding alternative solutions because of the backlog," defendant Schaeffer represented that "most of those orders" will be provisioned, stating:

> So Evan, I think two different things will happen. We will provision most of those orders, but there will be some customers who cannot wait. We are trying to be very transparent with customers, and it's a site-by-site discussion on what that provisioning window will look like.

> We know that with the network reconfigurations that we have going on, we'll have more than double the number of sites and a standardized provisioning window by year end. But in the intervening time, if a customer needs to go somewhere else and we can't provision, we are going to let them out of that obligation. I mean, if we want to do business with them going forward, we need to understand that this is a Cogent problem and not the customer's problem.
>
> Conversely, as we continue to build credibility with customers and we get more sites enabled and shorter provisioning windows, we actually anticipate the pace of that funnel building actually accelerating. In the last quarter, it took us basically five months from closing to build a funnel of 1,000. In the last quarter, we got that up to 2,300. And yes, there have been some ball-out, but the net number grew, and I think that will continue to grow.
>
> As I stated earlier, over the long run, I think it's not healthy to talk about funnels but install revenue. But until we get the network configured correctly and get enough sites where we can provision in an expeditious manner of a couple of weeks, we have to give both customers and investors an understanding of what the backlog looks like. Thanks,
>
> Now for a couple of comments around our long-term targets. Now that Cogent is fully integrated and combined with the Sprint business, we anticipate our long-term average revenue growth to remain between 5% and 7% annually. And we expect out EBITDA margins as adjusted to increase by approximately 100 basis points annually. This we be impacted in the short term by the step down in payments from T-Mobile.

54. During the call, defendant Schaeffer confidently confirmed that Cogent's wavelength backlog supported the Company's long-term financial targets by reiterating the Company's revenue growth target of 5% to 7% annually along with an EBITDA margin growth target of approximately 100 basis points, stating:

55. Also on February 29, 2024, Cogent filed its annual report on Form 10-K for fiscal year 2023 with the SEC (the "2023 Report"). The 2023 Report, which was signed by the Officer Defendants and the Director Defendants, confirmed that the Company expected to continue its dividend policy, stating in relevant part: "Based upon the historical growth rate of our dividend, we expect that we would have to provide approximately $379 million in order to meet our expected

quarterly dividend payments over the next two years . . . Based on current circumstances, we currently plan to continue our current dividend policy." The 2023 Report further confirmed that Cogent had the financial wherewithal to pay this dividend purportedly supported by Cogent's business, stating:

> We believe that our cash on hand and cash generated from our operating activities and cash from the IP Transit Services Agreement will be adequate to meet our working capital, capital expenditure, debt service, dividend payments and other cash requirements for the next twelve months and beyond the next twelve months if we execute our business plan.

56. On May 9, 2024, Cogent issued a release announcing its first quarter 2024 financial results for the three months ended March 31, 2024 ("1Q24"). The Company reported that wavelength revenue during the quarter was $3.3 million and wavelength customer connections increased sequentially from 661 to 693.

57. Cogent held an earnings call that day to discuss its 1Q24 results. Defendant Schaeffer stated that Cogent would be able to offer wavelength services in over 800 locations in North America with "much more rapid provisioning cycles" by the end of 2024. While acknowledging that not "all" customers may be able to wait for Cogent's ability to provision them, defendant Schaeffer highlighted the Company's purportedly increased wavelength backlog during the quarter, stating:

> The repurposing of the network to sell wavelength or optical transport services is progressing well. And the conversion of former Sprint switch sites and to data centers is also progressing, increasing Cogent's data center footprint and available power.
>
> We have a significant backlog and funnel of over 2,400 wavelength opportunities. However, due to these longer provision cycles, we are uncertain if all of these orders will remain with us through our ability to provision them.

58. Defendant Schaeffer similarly represented that Cogent was experiencing stronger than expected customer demand, stating:

> So first of all, on wavelengths, we continue to grow our funnel. We're actually trying to discourage customers until we can give them more realistic provisioning time lines. The demand for the routes that we have and the data centers that we are targeting is stronger then we had initially expected. As we outlined, we anticipate the wave business to be about a $500 million run rate business five years after the acquisition.
>
> We are hoping that we could grow that business linearly, meaning it would grow $100 million to $100 million business a year, post-closing $200 million in the second year. And our hope was based on the fact that the limited number locations that we initially serve would actually be the locations that the market wanted. That we discovered as we began selling was that the wave demand was much more diffused across a much larger number of data centers. It's not that the demand is not there. It's just spread out into facilities that we could not provision. So we do still believe that there will be a $500 million business by run rate of May of '28. I know that's a long time and investors want much nearer targets. The reconfiguration of the network is progressing. We are over halfway through brining on the number of sites that we need. We are not though yet in a position to have the standardized delivery that I spoke about. That will be in place by year end. We hope that that will allow us to eat into the backlog and to also accelerate new sales as we will be more comfortable in taking those orders with more standardized provisioning windows.

59. Also on May 9, 2024, Cogent filed with the SEC its quarterly report on Form 10-Q ("1Q24 Form 10-Q"). The 1Q24 Form 10-Q, which was signed by the Officer Defendants, confirmed that the Company expected to continue its dividend policy, stating in relevant part: "Based upon the historical growth rate of our dividend, we expect that we would have to provide approximately $382 million in order to meet our expected quarterly dividend payments over the next two years. . . . Based on current circumstances, we currently plan to continue our current dividend policy." The 1Q24 Form 10-Q further confirmed that Cogent had the financial wherewithal to pay this dividend as purportedly supported by Cogent's business, stating:

60. On August 8, 2024, Cogent issued a release announcing its second quarter 2024 financial results for the three months ended June 30, 2024 ("2Q24"). The Company reported that wavelength revenue increased sequentially to $3.6 million and wavelength customer connections increased sequentially from 693 to 754.

> We believe that our cash on hand and cash generated from our operating activities and cash from the IP Transit Services Agreement will be adequate to meet our working capital, capital expenditure, debt service, dividend payments and other cash requirements for the next 12 months and beyond the next 12 months if we execute our business plan.

61. Cogent also held an earnings call that day to discuss its 2Q24 results. On the call, defendant Schaeffer stated that defendants expected wavelength revenues to "materially accelerate starting in early 2025," stating:

> Our wave revenue increased modestly by 9% sequentially quarter-over-quarter to $3.6 million and that represents actually a 128.7% increase on a year-over-year basis. We expect this to materially accelerate starting in early 2025 as we will complete the network integration and optimization for wave services by year-end.

62. While updating investors on the status of the Company's network expansion and optimization program, defendant Schaeffer emphasized the Company's increased backlog of 2,700 orders during the quarter, stating:

> As of today, we have connectivity and wavelength capability services in 574 locations. However, our provisioning cycles remain elongated at about 90 days. We intend to substantially reduce that provisioning time as we complete the network optimization programs by year-end. We have sold wavelengths in 156 locations. By year-end 2024, we expect to be able to offer wavelength service in over 800 North American locations with substantially reduced provisioning cycles. We have a significant backlog and funnel of wave opportunities, representing over 2,700 unique wavelengths.

63. Defendant Schaeffer further represented that Cogent would be better positioned to provision its increasing backlog by year end as it achieved a shorter provisioning cycle, stating:

> We also remain focused on selling to large enterprises and are continuing to grow the business. We are enthusiastic about the addition of optical transport services or wavelengths to our product portfolio and the expansion of our data center footprint. We have a significant backlog and funnel of these wave opportunities at over 2,700 discrete wavelengths. And while we have accentuated provisioning cycles, we hope that with the network reconfiguration work, we can bring these orders installed in much shorter times by year-end. We're diligently working to complete the integration of the Sprint network and the Cogent network and the optimization.

64. Also on August 8, 2024, Cogent filed with the SEC its quarterly report on Form 10-Q ("2Q24 Form 10-Q"). The 2Q24 Form 10-Q, which was signed by the Officer Defendants, confirmed that the Company expected to continue its dividend policy, stating in relevant part: "Based upon the historical growth rate of our dividend, we expect that we would have to provide approximately $386 million in order to meet our expected quarterly dividend payments over the next two years. . . . Based on current circumstances, we currently plan to continue our current dividend policy." The 2Q24 Form 10-Q further confirmed that Cogent had the financial wherewithal to pay this dividend as purportedly supported by Cogent's business, stating:

> We believe that our cash on hand and cash generated from our operating activities and cash from the IP Transit Services Agreement will be adequate to meet our working capital, capital expenditure, debt service, dividend payments and other cash requirements for the next 12 months and beyond the next 12 months if we execute our business plan.

65. On November 7, 2024, Cogent issued a release announcing its third quarter 2024 financial results for the three months ended September 30, 2024 ("3Q24"). The Company reported that wavelength revenue increased sequentially to $5.3 million and wavelength customer connections increased sequentially from 754 to 1,041.

66. Cogent also held an earnings call that day to discuss its 3Q24 results. On the call, defendant Schaeffer highlighted the Company's purportedly robust wavelength backlog, stating:

> By the end of 2024, we expect to be able to offer wavelength services in over 800 locations with a much more rapid provisioning cycle. We have a backlog and funnel of wave opportunities of over 3,400 unique waelengths.

67. While defendant Schaeffer acknowledged that the Company was "not sure all of these orders will, in fact, be installed," he gave no indication that the vast majority of the claimed backlog was illusory, stating:

> We have a significant wavelength backlog, a funnel of over 3,400 wavelength opportunities. However, due to our longer provisioning cycles, we are not sure all

> of these orders will, in fact, be installed. We will substantially reduce that provisioning window by quarter end.

68. Also on November 7, 2024, Cogent filed with the SEC its quarterly report on Form 10-Q ("3Q24 Form 10-Q"). The 3Q24 Form 10-Q, which was signed by the Officer Defendants, confirmed that the Company expected to continue its dividend policy, stating in relevant part: "Based upon the historical growth rate of our dividend, we expect that we would have to provide approximately $386 million in order to meet our expected quarterly dividend payments over the next two years. . . . Based on current circumstances, we currently plan to continue our current dividend policy." The 3Q24 Form 10-Q further confirmed that Cogent had the financial wherewithal to pay this dividend as purportedly supported by Cogent's business, stating:

> We believe that our cash on hand and cash generated from our operating activities and cash from the IP Transit Services Agreement will be adequate to meet our working capital, capital expenditure, debt service, dividend payments and other cash requirements for the next 12 months and beyond the next 12 months if we execute our business plan.

69. On February 27, 2025, Cogent issued a release announcing its fourth quarter 2024 ("4Q24") and year-end 2024 ("FY24") financial results. The Company reported that 4Q24 wavelength revenue increased sequentially to $7 million and wavelength customer connections increased sequentially from 1,041 to 1,118.

70. Although Cogent reached its year-end target of having 800 wave-enabled data centers and had reduced its provisioning cycle to 30 days (from 90 days in 3Q24 and 120 days in 2Q24), investors were disappointed with the results. Cogent's annual revenue run rate was only $28 million – a far cry from the 2028 target of $500 million – and its backlog (as explained on the accompanying earnings call that day) declined sequentially from 3,400 in the prior quarter to 2,700 in the fourth quarter. Cogent management explained that the Company had removed 1,500 orders

from its backlog because many orders were more than a year old. Additionally, growth in wavelength connections slowed from 287 net additions in 3Q24 to 77 net additions in 4Q24.

71. In response to the news, the price of Cogent common stock closed down $7.65 per share, or 10%, on February 27, 2025 on abnormally high volume.

72. According to an analyst at TD Cowen, "shares pulled back likely on the weak Waves bookings," explaining investor disappointment further:

> On the Wave business, Cogent is clearly off to a slow start by installing just 77 Waves connections (vs. our estimate of 300) and delivering Waves revenue of just $8.0MM vs. our $7.2M and the St.'s $7.6MM. Cogent's Wavelenght backlog decreased from 3,400 to 2,700 as mgmt.. noted that it kicked out 1,500 connections from the funnel as they became stale and presumably found business elsewhere. With the broader equity markets sensitive around all things AI (whether it was DeepSeek or Microstoft), the Cogent loss of Waves backlog adds more fuel to these skittish concerns. Cogent's prior messaging that it could add 500 connections per moth has not become a "show me" having added just 77 connections in 4Q24. Still, mgmt.. did reach its target of 800 wave-ready data centers (and will actually have 880 data centers), encouragingly has lowered provision times to just 30 days (and will eventually reach two weeks), and reiterated its long-term Wave revenue target of $500MM by May 2028.

73. A Wells Fargo analyst expressed similar concerns about Cogent's wavelength business, writing: "A mixed print, with revenue declines offset by cost take-out, and wavelength revenues improving at a slower-than-hoped rate. Lots of questions on CCOI's ability to hold EBITDA steady as it awaits a wavelengths improvement and asset monetizations."

74. Despite these revelations, the price of Cogent common stock continued to trade at artificially inflated levels because defendants continued to conceal the true facts. To avoid a total collapse in the price of Cogent shares, defendants continued to make materially false and misleading statements that artificially inflated the trading price of Cogent common stock.

75. For example, during the FY24 earnings call, defendant Schaeffer continued to misrepresent demand for Cogent's optical wavelength services, conceal the true nature of the

Company's "backlog," and vastly understate the percentage of purported "orders" unlikely to be provisioned, stating:

> We have actually sold waves and installed them in 280 locations. And as we go through our existing sales funnel and backlog, some of those orders have dropped out, and at quarter-end, we still had 2,700 orders in our wavelength funnel.

76. Notably, defendant Schaeffer portrayed the Company as being in a position to fill its backlog of orders in a timely and meaningful manner, stating:

> We have a significant backlog and funnel of over 2,700 opportunities. While this is down slightly from the previous quarter, it's been due to grooming that funnel. Many of those opportunities have been in the funnel for over a year as we could not provision them.
>
> But now with the ubiquitous coverage and the more rapid provisioning cycles, we believe that we will continue to accelerate our wavelength business. We do have reduced provisioning cycles, and we hope to convert many of these opportunities and funnel into installed orders.

77. Defendant Schaeffer similarly stated that the pace of backlog installation would increase to approximately 500 waves per month, which would in turn accelerate new orders, stating:

> With regard to the pacing of installs, we are ramping up our full install capabilities. And we have both the field resources and service delivery coordinators to support the 500 a month. The hard part now has been working through the backlog that we have a flushing out which orders are still available for install and in which the customers had to go somewhere else. And some of these orders have been on the funnel for over a year. And that is a time-consuming process.
>
> And we have groomed the funnel. It did shrink, even though there were some new orders coming into the funnel. And now, we expect the funnel to actually accelerate in new order intake as we have demonstrated our ability to install. I think we're still probably a month or two away from getting to kind of full cadence of 500 installs a month as a result of this grooming exercise because it does take an iterative back and forth with the customer.

78. Defendant Schaeffer represented that the wavelength business was still on track to achieve its 2028 financial targets, reiterating the Company's $500 million annual revenue rate and robust customer demand and stating:

> We feel very comfortable about the target that we laid out at the closing of the deal in May of '23 and said within five years, we would be at a run rate of $500 million annually in wavelength sales. We think that the demand that we have received both in terms of order backlog and continued customer interest gives us a great deal of confidence we're going to make that number, particularly as we prove to the market our ability to actually deliver.
>
> The fact that there have been some customers in the funnel for over a year that are still taking waves is to me a little surprising, but some of them had enough confidence in us and we have delivered. For others, I think we have to build credibility and the way we're going to do that is install these waves. But we're very comfortable with our $500 million by mid '28 target for wavelength revenue.

79. On February 28, 2025, the Company filed with the SEC its FY24 annual report on Form 10-K ("2024 Report"). The 2024 Report, which was signed by the Officer Defendants and the Director Defendants, confirmed that the Company expected to continue its long-standing dividend policy, stating in relevant part:

> Based upon the historical growth rate of our dividend, we expect that we would have to provide approximately $399 million in order to meet our expected quarterly dividend payments over the next two years.
>
> In light of the economic uncertainties associated with the global economy, evolving hybrid work arrangements, the cash flow requirements of the Sprint Business, and the uncertain impact of proposed changes to economic and fiscal policies in the United States and other countries, our executive officers and Board of Directors have continued to carefully monitor our liquidity and cash requirements as well as our capital spending. After consideration of these circumstances, we currently plan to continue our current dividend policy.

80. The 2024 Report further confirmed that Cogent had the financial wherewithal to pay this dividend as purportedly supported by Cogent's business, stating:

> We believe that our cash on hand and cash generated from our operating activities and cash from the IP Transit Services Agreement will be adequate to meet our working capital,

> capital expenditure, debt service, dividend payments and other cash requirements for the next 12 months and beyond the next 12 months if we execute our business plan.

81. On March 21, 2025, S&P Global Ratings ("S&P") revised its outlook for Cogent Communications Group LLC ("Cogent Group") from stable to negative on weaker credit metrics. Cogent Group is Cogent's primary operating entity and sometimes issuer of debt. In support of its decision, S&P cited concern that Cogent's leverage would remain above S&P's downgrade trigger of 5.25x in 2025 after Cogent increased its leverage to 5.5x in 2024 from 4.3x in 2023. S&P further cited Cogent's flat organic revenue and EBITDA growth, noting that the growth in Cogent's wavelength business was mostly offset by elevated expenses incurred due to Cogent's ongoing data center refurbishment and wavelength enablement.

82. On May 8, 2025, Cogent issued a release announcing its first quarter 2025 financial results for the three months ended March 31, 2025 ("1Q25"). The Company reported that wavelength revenue increased sequentially to $7.1 million and wavelength customer connections increased sequentially from 1,118 to 1,322.

83. Investors were again disappointed by Cogent's wavelength business. Revenues were lower than expected, which had negatively impacted the Company's earnings, margins, and leverage. Although the Company had expanded its offering of optical wavelength services to over 880 data centers across North America, wavelength revenues only increased by $200,000 from 4Q24.

84. On the accompanying earnings call that day, defendants made a number of telling admissions that gave investors further pause. Many wavelength customers were purportedly not ready to accept delivery even though Cogent was ready to provision them. According to Company executives, Cogent now had the capacity to provision 500 orders per month but only expected to be able to convert 5% of its 3,400 order backlog ("about 160" per month). In other words, Cogent

had more installation capacity than orders that were ready to be installed. Defendant Schaeffer further admitted that 90% of the 3,400 backlog figure quoted with 3Q24 results "fell out" and that this shocking outcome was "as expected."

85. In response to the news, the price of Cogent common stock closed down $3.91 per share, or 7%, on May 8, 2025 on abnormally high volume.

86. A J.P. Morgan analyst expressly linked the stock price reaction to investor disappointment with the results of Cogent's wavelength business, writing: "Cogent's 1Q25 results were fine, but equity investors were underwhelmed with the company's progress on selling wavelength services . . ." The J.P. Morgan analyst further explained the market's reaction to the weaker than expected results:

> But slower than expected wave sales. Analyst projections for wave sales in 1Q were $10mn. But CCOI fell short of that with only $7.1mn in sales. The sale of wavelengths is a new business for Cogent, and its performance will likely have an outsized impact on how investors view its securities. Thus, the miss may have been the driving factor behind the company's double-digit stock sell-off following the release of results.

87. Other analysts similarly recognized Cogent's disappointing wavelength results and its importance to the Company's business. For example, an Oppenheimer analyst observed "[w]avelengths remain [the] key to revenue acceleration and margin expansion the next several quarters; this is ramping but was low in the quarter" and a Deutsche Bank analyst concluded: "Overall, the report was weak with both revenue and EBITDA behind the street. Wavelength sales growth was lackluster for a second quarter in a row which is somewhat concerning as this is the offset story to inherited Sprint losses."

88. Despite these revelations, the price of Cogent common stock continued to trade at artificially inflated levels because defendants continued to conceal the true facts. To avoid a total

collapse in the price of Cogent shares, defendants continued to make materially false and misleading statements that artificially inflated the trading price of Cogent common stock.

89. For example, during the 1Q25 earnings call, defendant Schaeffer continued to conceal the true nature of Cogent's backlog and customer demand issues as well as the attendant risks to investors created thereby. Specifically, defendant Schaeffer emphasized Cogent's purportedly robust wavelength backlog and claimed the Company remained on track to achieve its mid-2028 revenue target of $500 million (i.e., 25% of the $2 billion market), stating:

> We have provisioned and cleaned up our former backlog of wavelength orders. We currently have a backlog and funnel of 3,433 wavelength opportunities. With more wave provisioning experience and the actual ability to deliver services, we now anticipate that between 4% and 5% of this funnel will be installed each month going forward. We also expect based on the growth in the sales activity that by year-end, there will be 10,000 unique Wave opportunities in our funnel. We currently have provisioning capacity to install 500 waves per month. We intend to capture 25% of this highly concentrated North American market within three years.

90. According to defendant Schaeffer, Cogent had "much more clarity" into its growing backlog, which the Company purportedly expected to grow to 10,000 orders by year-end, stating:

> The funnel that we have now of 3,433 orders is a completely rebuilt funnel that was rebuilt from the end of Q3 2024 to the end of Q1 2025. We now have much more clarity around locations and about timing to be able to install.
>
> At 883 locations, we can service delivery coordinators to be able to provision 500 orders a month. With a 3,400 order backlog in funnel, which represents with a 5% conversion rate about 160. So, we have more installation capacity than orders that are ready to install.
>
> As we build credibility with customers, we will both see an uptick in the number of opportunities going into that funnel. Based on the sale forecast that we have, we anticipate that funnel to reach 10,000 from 3,430 by year-end, so in the next seven months.

91. To further support this misleading picture of customer demand, Cogent increased its long-term guidance for the Company's annual revenue growth rate from a range of 5% to 7% to a range 6% to 8%, as well as the Company's long-term guide for annual adjusted EBITDA

margin expansion from a 100 annual basis point increase to a 150 basis point increase. Defendant Schaeffer stated in pertinent part:

> Now that the Sprint business is combined with our legacy business, and we have fully analyzed the revenue burn off undesirable revenues, we are adjusting our long-term annual revenue growth rates to 6% to 8%, and we are increasing the rate at which we anticipate our EBITDA as adjusted margin to expand annually to 150 basis points.

92. On May 8, 2025, Cogent filed with the SEC its quarterly report on Form 10-Q ("1Q25 Form 10-Q"). The 1Q25 Form 10-Q, which was signed by the Officer Defendants, confirmed that the Company expected to continue its long-standing dividend policy, stating in relevant part: "Based upon the historical growth rate of our dividend, we expect that we would have to provide approximately $397 million in order to meet our expected quarterly dividend payments over the next two years. . . . Based on current circumstances, we currently plan to continue our current dividend policy." The 1Q25 Form 10-Q further confirmed that Cogent had the financial wherewithal to pay this dividend as purportedly supported by Cogent's business, stating:

> We believe that our cash on hand and cash generated from our operating activities and cash from the IP Transit Services Agreement will be adequate to meet our working capital, capital expenditure, debt service, dividend payments and other cash requirements for the next 12 months and beyond the next 12 months if we execute our business plan.

93. On August 7, 2025, Cogent issued a release announcing its second quarter 2025 financial results for the three months ended June 30, 2025 ("2Q25"). The Company reported that wavelength revenue increased sequentially to $9.1 million and wavelength customer connections increased sequentially from 1,322 to 1,469.

94. Cogent's 2Q25 results yet again failed to meet expectations. The Company only added 147 net connections during the quarter (compared to 204 in 1Q25), which was far less than

defendants' prior claims that Cogent would be installing 4% to 5% of its 3,433 wavelength backlog (approximately 155 wavelengths) per month.

95. On the accompanying earnings call held that day, defendant Schaeffer stated that Cogent had installed "several hundred" additional wavelengths during the quarter to customers who were not yet being billed because the customers were purportedly "surprised" by Cogent's quick provisioning times and were not able or willing to accept the service. In addition, Cogent's gross leverage ratio increased to 8.65x from 6.69x in 1Q25 and its net leverage ratio increased to 7.52x from 6.08x due to debt issued in April and reduced trailing 12 months EBITDA as a result of lower payments by T-Mobile under the IP Transit Services Agreement. These facts further undermined defendants' claims about Cogent's backlog, customer demand, and the Company's ability to continue its long-standing dividend policy.

96. In response to the news, the price of Cogent stock closed down $8.54 per share, or 19%, on August 7, 2025 on abnormally high volume, and declined an additional $4.72 per share, or 13%, on August 8, 2025 on abnormally high volume. Materially contributing to the stock price declines, on these two days JPMorgan Chase & Co. and Royal Bank of Canada seized 2.66 million shares of Cogent stock that defendant Schaeffer had pledged as collateral for loans and drove down the price of Cogent shares by selling the shares en masse for a total of $82.5 million. As defendant Schaeffer later acknowledged, his pledge of shares "created a cascade of bad events."

97. A BofA Securities analyst explained investor reaction and skepticism to the Company's weak wavelength results:

> Wavelength delays take the full spotlight of the 2Q print
>
> We reiterate our Underperform rating, lower our PO to $30 (from $50), and adjust our income rating to '8' same/lower from '7' same/higher for CCOI. Focus points on CCOI's 2Q25 results were 1) lack of wavelength business ramp, 2) data center optimization efforts, and 3) capital allocations philosophy. CCOI's wavelength

> business installed only 147 connections in 2Q (vs. Street expectations of 500). CCOI noted there are several hundred waves connected with customers, but not being billed due to customer capabilities. CCOI continues to shop >100MW of data center capacity to potential buyers at $10mn, but a deal remains unstruck much to investors dismay. The CCOI story remains a "show me" story as management has not delivered on its wavelength business ramp, even with the business being fully enabled since 1Q. CCOI's leverage also remains high vs. historic levels and the company quarterly divided payout is unsustainable at current operating and leverage trajectory.

98. A J.P. Morgan analyst similarly rebuked the Company's mid-2028 revenue target and openly questioned the Company's explanation for the slow pace of its sales and installations, positing instead that the slower ramp in installs reflected increased competition and "growing pains," stating:

> Cogent reported mixed 2Q results with better revenue (improved revenue decline q/q) but weaker EBITDA ($73m vs our $79m) due to lower margins. At the same time, CCOI's (billable) Waves installs were once again weaker than expected as customers were once again unable to accept delivery due to the company's rapid provision times. We question this dynamic and believe the slower ramp in installs is reflective of increased competition across the Waves ecosystem as well as growing pains. Accordingly, we lower 3Q25+ install expectations and meaningfully reduce our long-term Waves estimates on the above: we now forecast 2025 Waves revenue of $39m and annualized Waves revenue of $160m by mid-2028 (vs. management's target of $500m) Relatedly, while CEO Schaeffer is confident in Cogent's ability to deliver while increasing capital returns, we question CCOI's decision to begin buying back stock given leverage (6.6x on an adjusted basis exiting 2Q25) and liquidity concerns, and also believe it would be prudent for the company to pause its dividend growth. Questions on Cogent's EBITDA growth algorithm due to pressured legacy trends and a slower Waves ramp as well as diminishing prospects of a data center monetization event near term will only heighten fears of a pending dividend cut in the coming quarters.

99. Despite these revelations, the price of Cogent common stock continued to trade at artificially inflated levels because defendants continued to conceal the true facts. To avoid a total collapse in the price of Cogent shares, defendants continued to make materially false and misleading statements that artificially inflated the trading price of Cogent common stock.

100. For example, during the 2Q25 earnings call, defendant Schaeffer highlighted the Company's purportedly robust backlog and shortened provisioning time without disclosing the true state of customer demand and attendant risks, stating:

> As of the end of the quarter, we were offering wave line services in 938 data centers at 10 gig, 100 gig and 400 gig service models, materially, we also have reduced our provisioning intervals for approximately 30 days.
>
> Our wavelength revenues for the quarter were $9.1 million, a 150% increase on a year-over-year basis and a sequential increase of that revenue stream of 27%. As of the end of the quarter, we have sold wavelength in 418 locations. We currently have a backlog and funnel of 4,687 wavelength opportunities.

101. Defendants further attempted to shore up investor confidence by reaffirming Cogent's long-term revenue growth guidance and increasing Cogent's long-term EBITDA margin expansion guide from 150 basis points per year to an annual increase of 200 basis points, with defendant Schaeffer stating:

> We anticipate our long term average revenue growth to be between 6% and 8%. And we expect our EBITDA as adjusted margins to expend by approximately 200 basis points annually Our updated revenue and EBITDA guidance targets are meant to be multi year targets and are not intended to be specific quarterly or annual guidance.

102. When pressed about Cogent's ability to reach its mid-2028 $500 million revenue target, defendant Schaeffer professed his "confidence" that the Company remained on track with this target, stating:

> So first of all, on the confidence on wavelengths, we are actually more confident today than we were on last quarter's call or the quarter before or since we acquired Sprint. The reception that we have received from the customer base, the orders that we have in our funnel and the customer feedback that we've gotten from the orders that we have installed, all give us confidence that we will reach our $500 million run rate on wavelength revenue by mid-year 2028, which is identical to what we laid out in our justification in September of '22 when we announced the potential transaction that ultimately closed in My of '23.

103. Defendant Schaeffer likewise reaffirmed defendants' representation that Cogent would exit the fourth quarter of 2025 with a $20 million run rate in wavelength sales and denied that customers were delaying acceptance of orders due to over-purchasing, stating:

> Yes, we still feel confident that we will hit that quarterly run rate in the fourth quarter. And I do want to go back to the over purchasing and delay comment. That is not what we've heard from customers. It's really we're just surprised you did it when you said you would do it.

104. On August 7, 2025, Cogent filed with the SEC its quarterly report on Form 10-Q ("2Q25 Form 10-Q"). The 2Q25 Form 10-Q, which was signed by the Officer Defendants, reaffirmed Cogent's long-standing dividend policy, stating in relevant part: "Based upon the historical growth rate of our dividend, we expect that we would have to provide approximately $399 million in order to meet our expected quarterly dividend payments over the next two years. . . . Based on current circumstances, we currently plan to continue our current dividend policy." The 2Q25 Form 10-Q further confirmed that Cogent had the financial wherewithal to pay this dividend as purportedly supported by Cogent's business, stating:

> We believe that our cash on hand and cash generated from our operating activities and cash from the IP Transit Services Agreement will be adequate to meet our working capital, capital expenditure, debt service, dividend payments and other cash requirements for the next 12 months and beyond the next 12 months if we execute our business plan.

105. On August 14, 2025, S&P downgraded Cogent Group's issuer credit rating from B+ to B, its issue-level rating on the company's senior secured notes from BB to BB-, and its issue-level rating on the company's senior unsecured notes from B+ to B. S&P cited among other reasons for its decision: (i) a sharp increase in Cogent's leverage to 7.5x as of June 30, 2025; (ii) S&P's expectation that Cogent's leverage would now remain above S&P's downside trigger of 5.25x through 2026; (iii) wavelength sales that had underperformed expectations; and (iv) the

potential for a downgrade within the next 12 months if demand for Cogent's wavelength business failed to materialize.

106. On November 6, 2025, Cogent issued a release announcing its third quarter 2025 financial results for the three months ended September 30, 2025 ("3Q25"). The Company reported that wavelength revenue increased sequentially to $10.2 million and wavelength customer connections only increased sequentially by 281 connections from 1,469 to 1,750. These results were so weak that Cogent paused stock buybacks and reduced its quarterly dividend from $1.015 per share to $0.02 per share – a reduction of 98% – ending Cogent's streak of 52 straight quarters of increasing its dividend.

107. On the accompanying earnings call that day, Company executives stated that Cogent would maintain its new dividend policy until it reached a net leverage target of four times EBITDA on a last-twelve-months basis. Defendant Schaeffer additionally acknowledged that he was no longer confident that Cogent would have sufficient paying customers to reach the $20 million revenue run rate previously expected by the end of 2025.

108. In response to this news, the price of Cogent stock declined each day from November 6, 2025 through November 13, 2025, declining from a close of $38.30 per share on November 5, 2025, to a close of $16.68 per share on November 13, 2025, a total decline of $21.62 per share, or 56%, as the market digested the adverse revelations and their impact to Cogent's business and prospects.

109. Analysts sharply criticized the Company's results, with a Wells Fargo analyst cutting his wavelength sales estimates to only $200 million by 2028, less than half the $500 million amount still being quoted by the Company, casting further doubt on the Company's prospects:

> Dividend cuts and buybacks suspended with full prioritization on deleveraging. CCOI cut its quarterly dividend to $0.02/shr (from $1.015) and temporarily paused

> stock buybacks. The dividend will remain fixed until the company deleverages to 4.0x (from 7.4x in Q3), which will take significant time unless CCOI executes on significant asset sales. It also creates the pain of transitioning an income-focused shareholder base to a story that still has serious question marks on future growth.
>
> Wavelength growth remains slower than hopes. Wavelength revenue was $10.2M in Q3, +12% seq. v. +27% seq. growth in Q2, with +281 net installs coming in below our expectations. Mgmt also was hesitant on its previous aspiration to reach a $20MM annualized run-rate by Q4. With customers not as prepared to accept services quickly – and a notable competitive response from LUMN and T – we're slashing our waves estimates, including a modest ramp to nearly $200MM by 2028.

110. An RBC Capital Markets analyst similarly rejected the Company's $500 million revenue target, stating:

> Wavelength additions at 281 came well below consensus at 500. In our view, the demand for the wavelength business has not materialized to ramp to 500 monthly installs and eventually hit its $500M wavelength run-rate revenue target by mid 2028. Like the previous quarter, the company installed more wavelengths than customers accepted. For Q4, we expect a marginal improvement in wavelength additions to 400.

111. Despite these revelations, the price of Cogent common stock continued to trade at artificially inflated levels because defendants continued to conceal the true facts. To avoid a total collapse in the price of Cogent shares, defendants continued to make materially false and misleading statements that artificially inflated the trading price of Cogent common stock.

112. For example, on the November 6, 2025 earnings call, defendant Schaeffer highlighted the Company's backlog and claimed that the Company remained on track for its mid-2028 wavelength revenue goals (i.e., 25% of the available market), stating:

> We currently have a backlog and funnel of wave opportunities of 5,221 opportunities. We intend to continue to capture market share and believe our goal of 25% of the highly concentrated long-haul wavelength market in North America in three years is achievable.

113. Furthermore, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues

or income from continuing operations" in its periodic quarterly and annual financial reports filed with the SEC. Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, Defendants, in the "Risk Factors" section of those reports, to discuss the material factors that made an investment in Cogent speculative or risky and to adequately describe each such risk.

114. Under Item 303, given the importance of Cogent's optical wavelength business to the Company's financial operations and prospects, Cogent's periodic reports were required to describe the known trends and uncertainties relating to the backlog in the Company's wavelength orders, including adverse client demand trends and the high likelihood that these purported orders would never be consummated. Similarly, under Item 105, these adverse facts should have been disclosed because they created significant risks that made an investment in Cogent common stock speculative and risky. Indeed, the boilerplate risk discussions provided in the Company's SEC filings were themselves materially misleading because they provided generic statements of potential or contingent risk, yet failed to disclose the adverse events that had already transpired and therefore posed an imminent threat to the Company's business and operations. For example, the "Risk Factors" contained in the Company's 2023 Report stated Cogent "may not realize the anticipated benefits of the acquisition of the Sprint Business" and "may not succeed" in adding customers, yet failed to disclose that the vast majority of the Company's claimed backlog was illusory and the difficulties the Company was already experiencing in adding and retaining customers for its optical wavelength products and services:

> We may not realize the anticipated benefits of the acquisition of the Sprint Business, and the integration of the Sprint Business may disrupt our business and management.

115. The foregoing statements were materially false and misleading, and failed to disclose materially adverse facts about the Company's business, operations, and financial

condition. Specifically, the statements failed to disclose that: (a) that the vast majority of the purported orders in Cogent's optical wavelength "backlog" were unlikely to ever result in a paid order; (b) that large quantities of the customers in Cogent's purported optical wavelength "backlog" were unable or unwilling to accept delivery even if Cogent was in a position to provision the wavelength in a timely manner; (c) that, as a result of (a)-(b) above, defendants had materially misrepresented customer demand for Cogent's optical wavelength services and the nature of the Company's purported "backlog" of wavelength orders; (d) that, as a result of (a)-(c) above, Cogent was not on track to achieve its revenue and margin targets and such targets lacked a reasonable basis in objective fact; (e) that Cogent did not have the financial capacity or business fundamentals to maintain its long-standing dividend policy; and (f) that there was a material, undisclosed risk that defendant Schaeffer would be forced to sell vast quantities of Cogent stock as a result of his high-risk pledging activities, thereby further depressing the price of Cogent stock in the event the truth regarding Cogent's "backlog," demand issues, and financial position were ever revealed.

## C. The Truth is Revealed

116. On February 20, 2026, Cogent issued a release announcing its fourth quarter 2025 ("4Q25") and year-end 2025 ("FY25") financial results for the three and twelve months ended December 31, 2025. The Company reported that wavelength revenue increased sequentially to $12.1 million for the quarter and wavelength customer connections increased sequentially by 314 connections from 1,750 to 2,064.

117. In a break with the Company's prior practice, defendants refused to provide a specific backlog amount on the accompanying earnings call. When defendant Schaeffer was questioned about the Company's backlog target of 10,000 orders by the end of FY25, Schaeffer explained that the Company was no longer going to provide specific numbers, stating:

> And now, Sam. I'll touch on your waves question. While we were in the process of enabling the footprint, we felt it was critical to give funnel KPIs to show expressions of interest by customers. We have tried to be clear with investors that we do not give funnel data routinely for our other products, and we're treating wavelengths now as any other product. Now we do in our investor presentation typically show both our on-net and off-net conversion rates for the previous quarter. We intend to continue to do that.
>
> Our funnel is continuing to grow, but we will not be reporting specific numbers. But we do anticipate with the footprint that we now have and the credibility that we are earning with existing customers, we are starting to see a larger percentage of their wave opportunities being shown to us for bid. As a result of that, we will close more and see further acceleration in the waves business.

118. In response to the news, the price of Cogent common stock closed down $7.72 per share, or 29%, on February 20, 2026 on abnormally high volume, and the price of the stock closed down $0.72 per share, or 4%, on February 23, 2026 on abnormally high volume.

119. Despite these revelations, the price of Cogent common stock continued to trade at artificially inflated levels because defendants continued to conceal the full truth and the scope of the problems in Cogent's business, operations, and financial condition.

120. Finally, on May 4, 2026, Cogent issued a release announcing its first quarter 2026 ("1Q26") financial results for the three months ended March 31, 2026. The Company reported that its wavelength revenue had increased sequentially to $13.6 million for the quarter and that its wavelength customer connections had increased sequentially by just 199 connections from 2,064 to 2,263.

121. During the corresponding 1Q26 earnings call, defendant Schaeffer conceded: "On wavelength installs, we have seen a variety of customers pushing out their acceptance of wavelengths. We actually provisioned more wavelengths in the quarter than we did in the previous quarter, but the customers did not accept them. Decision to push out acceptance is being driven by constraints."

122. In response to the news, the price of Cogent common stock closed down $6.79 per share, or 29%, on May 4, 2026 on abnormally high volume to close at $16.37 per share – a decline of over 80% from the Class Period high of more than $86 per share.

123. A May 26, 2026 Morningstar analyst report summarized market sentiment as follows:

> Accelerating growth in the wavelength business is most critical to meeting our growth expectations and moving the shares higher from here. Management has overpromised and underdelivered in this segment . . . .

**D. Defendants' Misconduct Has and Continues to Harm the Company**

124. As a direct and proximate result of the Defendants' conduct, the Company has been harmed and will continue to be. The harm includes, but is not limited to, the costs already incurred and to be incurred defending the Company in the securities class action *City of Southfield Fire and Police Retirement System v. Cogent Communications Holdings, Inc., et al.*, No. 1:26-cv-02609 (D.D.C. filed July 23, 2026), as well as costs to be incurred in remediating deficiencies in the Company's internal controls.

125. Cogent's reputation and goodwill have also been damaged by the Defendants' misconduct.

126. During the Relevant Time Period, Cogent paid substantial compensation to the Officer Defendants, the vast majority of which consisted of stock awards tied to the value and performance of Cogent common stock.

127. In fiscal year 2024, Defendant Schaeffer received total compensation of approximately $12.7 million, of which approximately $12.5 million, or about 98.5%, consisted of stock awards. In fiscal year 2025, Defendant Schaeffer received total compensation of

approximately $25.4 million, of which approximately $24.8 million, or about 97.9%, consisted of stock awards.

128. Defendant Weed also received substantial compensation from Cogent during the Relevant Time Period. In fiscal year 2024, Weed received total compensation of approximately $4.46 million, of which approximately $4.09 million, or about 91.6%, consisted of stock awards.

129. In fiscal year 2025, Weed received total compensation of approximately $4.83 million, of which approximately $4.45 million, or about 92.2%, consisted of stock awards.

130. The Defendants failed to oversee and manage the Company in accordance with their fiduciary duties and Company policies, making the compensation provided by the Company excessive. The Officer Defendants received millions of dollars in equity compensation based on stock prices that had been inflated because of the false and misleading statements made or caused by the Defendants. The Board has not clawed back any of this compensation.

131. Cogent's reputation and goodwill have also been damaged by the Defendants' misconduct.

132. The Company has already incurred, and will continue to incur, substantial costs and expenses as a result of Defendants' misconduct, including investigating the underlying misconduct, and implementing remedial measures to address the Company's governance, disclosure, and internal-control deficiencies. These costs constitute direct harm to the Company.

**E. Cogent Issues False and Misleading Proxy Statements**

133. In addition to the false and misleading statements discussed above, the Director Defendants also caused the Company to issue false and misleading proxy statements during the Relevant Period, including the Schedule 14A Proxy Statement issued on March 25, 2024 (the "2024 Proxy"); the Schedule 14A Proxy Statement issued on March 26, 2025 (the "2025 Proxy")

and the Schedule 14A Proxy Statement issued on March 20, 2026 (the "2026 Proxy"), that sought stockholder votes to, among other things, re-elect the Director Defendants to serve on the Board.

134. The Director Defendants drafted, approved, reviewed, and/or signed the 2024 Proxy, the 2025 Proxy and the 2026 Proxy before they were filed with the SEC and disseminated to Cogent's stockholders. The Director Defendants negligently issued materially misleading statements in the 2024, the 2025 and the 2026 Proxies. These allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Director Defendants and they do not allege or do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference or any allegation of fraud, scienter, or recklessness with regard to the Proxies' allegations and related claims.

135. In support of re-electing themselves, Defendants highlighted their supposed oversight of the Company in the 2024 Proxy. The 2024 Proxy stated:

> *Corporate Governance Guidelines*
>
> The Board has adopted corporate governance guidelines that establish a framework within which our directors and management can effectively pursue the Company's objectives for the benefit of our stockholders. The Board believes that establishing these guidelines enhances its ability to foster sustainable growth and create value for our stockholders. The corporate governance guidelines may be found on the Company's website under the tab "About Cogent; Investor Relations; Governance" at www.cogentco.com.

136. In support of re-electing themselves, Defendants highlighted their supposed oversight of the Company in the 2025 Proxy. The 2025 Proxy stated:

> *Corporate Governance Guidelines*
>
> The Board has adopted corporate governance guidelines that establish a framework within which our directors and management can effectively pursue the Company's objectives for the benefit of our stockholders. The Board believes that establishing these guidelines enhances its ability to foster sustainable growth and create value

> for our stockholders. The corporate governance guidelines may be found on the Company's website under the tab "About Cogent; Investor Relations; Governance" at www.cogentco.com.

137. In support of re-electing themselves, Defendants highlighted their supposed oversight of the Company in the 2026 Proxy. The 2026 Proxy stated:

> *Corporate Governance Guidelines*
>
> The Board has adopted corporate governance guidelines that establish a framework within which our directors and management can effectively pursue the Company's objectives for the benefit of our stockholders. The Board believes that establishing these guidelines enhances its ability to foster sustainable growth and create value for our stockholders. The corporate governance guidelines may be found on the Company's website under the tab "About Cogent; Investor Relations; Governance" at www.cogentco.com.

138. The Proxies thus assured stockholders that the Director Defendants understood Company-wide risks, actively oversaw the Company's risks and exposures, as well as steps taken to monitor and mitigate risk exposures. In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Defendants from causing the Company to make materially false and misleading statements concerning Cogent.

139. As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to re-elect the Director Defendants to the Board.

### F. The Board Breached its Fiduciary Duties

140. As officers and/or directors of Cogent, the Defendants owed Cogent fiduciary duties of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Cogent in a fair, just, honest and equitable manner. The conduct of the Director Defendants involves a knowing or reckless violation of their obligations as directors and officers of Cogent, the absence of good faith on their part, and a reckless disregard for their duties to the

Company that Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

141. Defendants, because of their positions of control and authority as directors and/or officers of Cogent, were able to and did exercise control over the wrongful acts complained of herein. As officers and/or directors of a publicly-traded company, the Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding Cogent's financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

142. To discharge their duties, the officers and directors of Cogent were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors and Cogent were required to, among other things:

(a) Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the Company's stockholders;

(b) Conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(d) Oversee public statements made by the Company's officers and employees as to the financial condition of the Company at any given time, including ensuring that any statements about the Company's financial results and prospects are accurate, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e) Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(f) Maintain and implement an adequate and functioning system of internal controls to ensure that the Company complied with all applicable laws, rules, and regulations; and

(g) Ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

143. The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

144. In addition, as officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

## DERIVATIVE ALLEGATIONS

145. Plaintiff brings this action derivatively in the right and for the benefit of Cogent to redress injuries suffered by Cogent as a direct result of the Director Defendants' breaches of fiduciary duty. Cogent is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

146. Plaintiff will adequately and fairly represent the interests of Cogent in enforcing and prosecuting the Company's rights.

147. Plaintiff was a stockholder of Cogent at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is currently a Cogent stockholder.

## DEMAND FUTILITY ALLEGATIONS

148. Plaintiff repeats, re-alleges, and incorporates by reference each and every allegations set forth as though fully set forth herein.

149. The Cogent Board currently has eight members: David Schaeffer, Paul De Sa, Steven Brooks, Sheryl Kennedy, Marc Montagner, Lewis H. Ferguson III, Deneen Howell, and Eve Howard.

150. Plaintiff has not made any demand on Cogent's current Board to institute this action against the Director Defendants, as any pre-suit demand would be excused. The Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

151. The Director Defendants had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. In addition, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.

152. The Director Defendants' making or authorization of the false and misleading statements discussed above caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of Cogent. The failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required due diligence, constitute breaches of fiduciary duties that have resulted in the Director Defendants facing a substantial likelihood of liability. The Director Defendants

could not fairly and fully prosecute this action or any other action concerning the misconduct described above.

**A. Demand is Excused as to Defendant Schaeffer**

153. Defendant Schaeffer is Cogent's founder, President, Chief Executive Officer, and a member of the Board. Schaeffer is not independent because he serves as the Company's chief executive officer and depends on Cogent for compensation and other benefits. In 2024, Schaeffer received total compensation of approximately $12.7 million from Cogent, consisting almost entirely of equity awards tied to the value and performance of Cogent stock. In 2025, Schaeffer received total compensation of approximately $25.4 million from Cogent, consisting almost entirely of equity awards tied to the value and performance of Cogent stock, with approximately $24.8 million, or about 97.9%, attributable to stock awards. In addition, Cogent's proxy statements identify Schaeffer as the Company's President and Chief Executive Officer and do not classify him as an independent director under applicable NASDAQ listing standards. Accordingly, Schaeffer cannot independently and disinterestedly consider a demand to sue himself and other members of the Board concerning the misconduct alleged herein.

154. Defendant Schaeffer served as a director of the Company during the Relevant Time Period. As a director, Defendant Schaeffer had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Schaeffer was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

155. Defendant Schaeffer failed to conduct oversight of the Company's internal controls over financial reporting and the Company's statements to regulators, investors, and the public. By

consciously disregarding the duty to monitor Cogent's controls, Defendant Schaeffer failed to protect corporate assets.

156. Defendant Schaeffer was an active participant in the misconduct described above. Defendant Schaeffer signed the Forms 10-K, as well as the Forms 10-Q filed by the Company during the Relevant Time Period. Defendant Schaeffer made false and misleading statements concerning Cogent.

157. In addition, Defendant Schaeffer is a named defendant in the Securities Class Action.

158. Thus, Defendant Schaeffer faces a substantial likelihood of liability.

**B. Demand is Excused as to Defendant De Sa**

159. Defendant De Sa served as a director of the Company during the Relevant Time Period. As a director, Defendant De Sa had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant De Sa was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

160. Defendant De Sa failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Cogent's controls, Defendant De Sa failed to protect corporate assets.

161. According to the Schedule 14A Proxy Statement filed with the SEC on March 20, 2026 (the "2026 Proxy Statement"), De Sa served as director on the Board of Directors of Cogent Communications Holdings, Inc. during 2025. In 2025, he received $443,308 in total board

compensation, which consisted of $4,000 in cash fees earned and $439,308 in stock awards. Stock awards accounted for approximately 99.1% of his total board earnings for the year, with no option grants or other non-cash compensation received.

162. According to the Schedule 14A Proxy Statement filed with the SEC on March 26, 2025 (the “2025 Proxy Statement”), De Sa served as director on the Board of Directors of Cogent Communications Holdings, Inc. during 2024. In 2024, De Sa received approximately $400,009 in total compensation for his Board service, consisting principally of Cogent stock awards.

163. Because De Sa’s director compensation was tied substantially to Cogent common stock, he was financially aligned with the Company’s stock price and cannot independently and disinterestedly consider a demand to sue the Board concerning the misconduct alleged herein.

164. Defendant De Sa was an active participant in the misconduct described above. Defendant De Sa signed the Forms 10-K during the Relevant Time Period. Defendant De Sa therefore faces a substantial likelihood of liability.

165. Defendant De Sa knowingly or recklessly disregarded failures in the Company’s internal controls. Accordingly, Defendant De Sa breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant De Sa faces a substantial likelihood of liability for these breaches, making any demand on Defendant De Sa futile.

166. Accordingly, Defendant De Sa cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

**C. Demand is Excused as to Defendant Brooks**

167. Defendant Brooks served as a director of the Company during the Relevant Time Period. As a director, Defendant Brooks had a duty to ensure that the Company’s SEC filings, press releases, and other public statements and presentations concerning its business, operations,

prospects, internal controls, and financial statements were accurate. Defendant Brooks was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

168. Defendant Brooks failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Cogent's controls, Defendant Brooks failed to protect corporate assets.

169. According to the Schedule 14A Proxy Statement filed with the SEC on March 20, 2026 (the "2026 Proxy Statement"), Brooks served as director on the Board of Directors of Cogent Communications Holdings, Inc. during 2025. In 2025, he received $443,308 in total board compensation, which consisted of $4,000 in cash fees earned and $439,308 in stock awards. Stock awards accounted for approximately 99.1% of his total board earnings for the year, with no option grants or other non-cash compensation received.

170. According to the Schedule 14A Proxy Statement filed with the SEC on March 26, 2025 (the "2025 Proxy Statement"), Brooks served as director on the Board of Directors of Cogent Communications Holdings, Inc. during 2024. In 2024, Brooks received approximately $400,009 in total compensation for his Board service, consisting principally of Cogent stock awards.

171. Because Brook's director compensation was tied substantially to Cogent common stock, he was financially aligned with the Company's stock price and cannot independently and disinterestedly consider a demand to sue the Board concerning the misconduct alleged herein.

172. Defendant Brooks was an active participant in the misconduct described above. Defendant Brooks signed the Forms 10-K during the Relevant Time Period. Defendant Brooks therefore faces a substantial likelihood of liability.

173. Defendant Brooks knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Brooks breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Brooks faces a substantial likelihood of liability for these breaches, making any demand on Defendant Brooks futile.

174. Accordingly, Defendant Brooks cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

**D. Demand is Excused as to Defendant Kennedy**

175. Defendant Kennedy served as a director of the Company during the Relevant Time Period. As a director, Defendant Kennedy had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Kennedy was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

176. Defendant Kennedy failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Cogent's controls, Defendant Kennedy failed to protect corporate assets.

177. According to the Schedule 14A Proxy Statement filed with the SEC on March 20, 2026 (the "2026 Proxy Statement"), Kennedy served as director on the Board of Directors of Cogent Communications Holdings, Inc. during 2025. In 2025, she received $443,308 in total board compensation, which consisted of $4,000 in cash fees earned and $439,308 in stock awards. Stock awards accounted for approximately 99.1% of her total board earnings for the year, with no option grants or other non-cash compensation received.

178. According to the Schedule 14A Proxy Statement filed with the SEC on March 26, 2025 (the "2025 Proxy Statement"), Kennedy served as director on the Board of Directors of Cogent Communications Holdings, Inc. during 2024. In 2024, Kennedy received approximately $400,009 in total compensation for her Board service, consisting principally of Cogent stock awards.

179. Because Kennedy's director compensation was tied substantially to Cogent common stock, she was financially aligned with the Company's stock price and cannot independently and disinterestedly consider a demand to sue the Board concerning the misconduct alleged herein.

180. Defendant Kennedy was an active participant in the misconduct described above. Defendant Kennedy signed the Forms 10-K during the Relevant Time Period. Defendant Kennedy therefore faces a substantial likelihood of liability.

181. Defendant Kennedy knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Kennedy breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Kennedy faces a substantial likelihood of liability for these breaches, making any demand on Defendant Kennedy futile.

182. Accordingly, Defendant Kennedy cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

**E. Demand is Excused as to Defendant Montager**

183. Defendant Montager served as a director of the Company during the Relevant Time Period. As a director, Defendant Montager had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations,

prospects, internal controls, and financial statements were accurate. Defendant Montager was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

184. Defendant Montager failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Cogent's controls, Defendant Montager failed to protect corporate assets.

185. According to the Schedule 14A Proxy Statement filed with the SEC on March 20, 2026 (the "2026 Proxy Statement"), Montager served as director on the Board of Directors of Cogent Communications Holdings, Inc. during 2025. In 2025, he received $443,308 in total board compensation, which consisted of $4,000 in cash fees earned and $439,308 in stock awards. Stock awards accounted for approximately 99.1% of his total board earnings for the year, with no option grants or other non-cash compensation received.

186. According to the Schedule 14A Proxy Statement filed with the SEC on March 26, 2025 (the "2025 Proxy Statement"), Montager served as director on the Board of Directors of Cogent Communications Holdings, Inc. during 2024. In 2024, Montager received approximately $399,009 in total compensation for his Board service, consisting principally of Cogent stock awards.

187. Because Montager's director compensation was tied substantially to Cogent common stock, he was financially aligned with the Company's stock price and cannot independently and disinterestedly consider a demand to sue the Board concerning the misconduct alleged herein.

188. Defendant Montager was an active participant in the misconduct described above. Defendant Montager signed the Forms 10-K during the Relevant Time Period. Defendant Kennedy therefore faces a substantial likelihood of liability.

189. Defendant Montager knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Montager breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Montager faces a substantial likelihood of liability for these breaches, making any demand on Defendant Montager futile.

190. Accordingly, Defendant Montager cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

**F. Demand is Excused as to Defendant Ferguson**

191. Defendant Ferguson served as a director of the Company during the Relevant Time Period. As a director, Defendant Ferguson had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Ferguson was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

192. Defendant Ferguson failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Cogent's controls, Defendant Ferguson failed to protect corporate assets.

193. According to the Schedule 14A Proxy Statement filed with the SEC on March 20, 2026 (the "2026 Proxy Statement"), Ferguson served as director on the Board of Directors of

Cogent Communications Holdings, Inc. during 2025. In 2025, he received $442,308 in total board compensation, which consisted of $3,000 in cash fees earned and $439,308 in stock awards. Stock awards accounted for approximately 99.3% of his total board earnings for the year, with no option grants or other non-cash compensation received.

194. According to the Schedule 14A Proxy Statement filed with the SEC on March 26, 2025 (the "2025 Proxy Statement"), Ferguson served as director on the Board of Directors of Cogent Communications Holdings, Inc. during 2024. In 2024, Ferguson received approximately $400,009 in total compensation for his Board service, consisting principally of Cogent stock awards.

195. Because Ferguson's director compensation was tied substantially to Cogent common stock, he was financially aligned with the Company's stock price and cannot independently and disinterestedly consider a demand to sue the Board concerning the misconduct alleged herein.

196. Defendant Ferguson was an active participant in the misconduct described above. Defendant Ferguson signed the Forms 10-K during the Relevant Time Period. Defendant Ferguson therefore faces a substantial likelihood of liability.

197. Defendant Ferguson knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Ferguson breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Ferguson faces a substantial likelihood of liability for these breaches, making any demand on Defendant Ferguson futile.

198. Accordingly, Defendant Ferguson cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

**G. Demand is Excused as to Defendant Howard**

199. Defendant Howard served as a director of the Company during the Relevant Time Period. As a director, Defendant Howard had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Howard was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

200. Defendant Howard failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Cogent's controls, Defendant Howard failed to protect corporate assets.

201. According to the Schedule 14A Proxy Statement filed with the SEC on March 20, 2026 (the "2026 Proxy Statement"), Howard served as director on the Board of Directors of Cogent Communications Holdings, Inc. during 2025. In 2025, she received $443,308 in total board compensation, which consisted of $4,000 in cash fees earned and $439,308 in stock awards. Stock awards accounted for approximately 99.1% of his total board earnings for the year, with no option grants or other non-cash compensation received.

202. According to the Schedule 14A Proxy Statement filed with the SEC on March 26, 2025 (the "2025 Proxy Statement"), Howard served as director on the Board of Directors of Cogent Communications Holdings, Inc. during 2024. In 2024, Howard received approximately $400,009 in total compensation for her Board service, consisting principally of Cogent stock awards.

203. Because Howard's director compensation was tied substantially to Cogent common stock, she was financially aligned with the Company's stock price and cannot independently and disinterestedly consider a demand to sue the Board concerning the misconduct alleged herein.

204. Defendant Howard was an active participant in the misconduct described above. Defendant Howard signed the Forms 10-K during the Relevant Time Period. Defendant Howard therefore faces a substantial likelihood of liability.

205. Defendant Howard knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Howard breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Howard faces a substantial likelihood of liability for these breaches, making any demand on Defendant Howard futile.

206. Accordingly, Defendant Howard cannot reasonably and objectively consider a demand to sue the Board that controls her  continued compensation.

**H. Demand is Excused as to Defendant Howell**

207. Defendant Howell served as a director of the Company during the Relevant Time Period. As a director, Defendant Howell had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Howell was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

208. Defendant Howell failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Cogent's controls, Defendant Howell failed to protect corporate assets.

209. According to the Schedule 14A Proxy Statement filed with the SEC on March 20, 2026 (the "2026 Proxy Statement"), Howell served as director on the Board of Directors of Cogent Communications Holdings, Inc. during 2025. In 2025, she received $443,308 in total board compensation, which consisted of $4,000 in cash fees earned and $439,308 in stock awards. Stock awards accounted for approximately 99.1% of her total board earnings for the year, with no option grants or other non-cash compensation received.

210. According to the Schedule 14A Proxy Statement filed with the SEC on March 26, 2025 (the "2025 Proxy Statement"), Howell served as director on the Board of Directors of Cogent Communications Holdings, Inc. during 2024. In 2024, Howell received approximately $399,009 in total compensation for her Board service, consisting principally of Cogent stock awards.

211. Because Howell's director compensation was tied substantially to Cogent common stock, she was financially aligned with the Company's stock price and cannot independently and disinterestedly consider a demand to sue the Board concerning the misconduct alleged herein.

212. Defendant Howell was an active participant in the misconduct described above. Defendant Howell signed the Forms 10-K during the Relevant Time Period. Defendant Howell therefore faces a substantial likelihood of liability.

213. Defendant Howell knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Howell breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Howell faces a substantial likelihood of liability for these breaches, making any demand on Defendant Howell futile.

214. Accordingly, Defendant Howell cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

215. Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will be able to prove that these individuals breached their fiduciary duties by condoning the misconduct and failing to take meaningful action to remedy the resultant harm.

## **CLAIMS FOR RELIEF**

## **COUNT I**

### **Breach of Fiduciary Duty**
### **(Derivatively Against The Director Defendants)**

216. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

217. Each of the Director Defendants owed and owes Cogent the highest obligations of loyalty, good faith, due care, and oversight.

218. Each of the Director Defendants violated and breached their fiduciary duties of loyalty, good faith, candor and oversight to the Company.

219. The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. In breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

220. In addition, the Director Defendants further breached their fiduciary duties owed to Cogent by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the misrepresentations and failure to disclose that the Company's reported wavelength backlog materially overstated actual customer demand because a substantial portion of the purported orders were unlikely to convert into paying customer revenue, customers were delaying or declining acceptance of provisioned wavelengths, and Cogent

lacked a reasonable basis to represent that its wavelength business could support its stated growth targets and long-standing dividend policy. The Director Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact, exposing them to personal liability to the Company for breaching their fiduciary duties.

221. The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls. The Director Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

222. As a direct and proximate result of the breaches of duty alleged herein, Cogent has sustained and will sustain significant damages.

223. As a result of the misconduct alleged herein, these Defendants are liable to the Company.

224. Plaintiff, on behalf of Cogent, has no adequate remedy at law.

## COUNT II

**Breach of Fiduciary Duty**
**(Derivatively Against the Officer Defendants)**

225. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

226. The Officer Defendants are executive officers of the Company. As executive officers, the Officer Defendants owed and owe Cogent the highest obligations of loyalty, good faith, due care, oversight, and candor.

227. The Officer Defendants breached their fiduciary duties owed to Cogent by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact, failing to disclose the material adverse facts concerning Cogent's optical wavelength business, including that the Company's reported backlog overstated actual customer demand, that many purported orders were unlikely to convert into paying customer revenue, that customers were delaying or declining acceptance of provisioned wavelengths, and that Cogent lacked a reasonable basis to represent that its wavelength business could support its stated growth targets and long-standing dividend policy. The Officer Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact.

228. As a direct and proximate result of the breaches of duty alleged herein, Cogent has sustained and will sustain significant damages.

229. As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

230. Plaintiff, on behalf of Cogent, has no adequate remedy at law.

**COUNT III**

**Gross Mismanagement**
**(Against All Defendants)**

231. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

232. By their actions alleged herein, the Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation

233. As a direct and proximate result of the Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages.

234. As a direct and proximate result of the gross mismanagement and breaches of duty alleged herein, Cogent has sustained and will sustain significant damages.

235. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

236. Plaintiff, on behalf of Cogent, has no adequate remedy at law.

**COUNT IV**

**Waste of Corporate Assets**
**(Derivatively Against All Defendants)**

237. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

238. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Time Period. It resulted in continuous, connected, and ongoing harm to the Company.

239. As a result of the misconduct described above, the Defendants wasted corporate assets by, inter alia: (i) paying excessive compensation and bonuses to certain of its executive

officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

240. As a direct and proximate result of the waste of corporate assets and breaches of duty alleged herein, Cogent has sustained significant damages.

241. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

242. Plaintiff, on behalf of Cogent, has no adequate remedy at law.

**COUNT V**

**Unjust Enrichment**
**(Derivatively Against the Officer Defendants)**

243. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

244. By their wrongful acts, violations of law, and false or misleading statements or omissions of material fact that they caused to be made, the Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

245. The Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price, or received compensation or other payments that were unjust in light of the Defendants' bad faith conduct.

246. Plaintiff, on behalf of Cogent, seeks restitution from the Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation

based compensation, obtained by the Defendants due to their wrongful conduct and breach of their fiduciary duties.

**COUNT VI**
**Violation of Section 14(a) of the Exchange Act**
**(Against The Director Defendants)**

247. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

248. The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

249. The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2025 and 2026 Proxies. In the Proxies, the Board solicited stockholder votes to reelect the Director Defendants to the Board.

250. The Proxies, however, misrepresented and failed to disclose the Board's risk oversight and the Company's inadequate internal controls, which facilitated the illegal behavior described herein. By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, Cogent misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect the Director Defendants.

251. Plaintiff, on behalf of Cogent, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxies in connection with the improper reelection of the Director Defendants to the Board.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff demands judgment as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of Cogent and that Plaintiff is a proper and adequate representative of the Company;

B. Against all of the Defendants and in favor of Cogent for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C. Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D. Awarding Cogent restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F. Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

September 10, 2026


**SUTTER & TERPAK, PLLC**

/s/_______________________
Matthew T. Sutter, DCB 477910
7540 Little River Turnpike, Suite A
Annandale, Virginia 22003
Telephone: (703) 256-1800
Facsimile: (703) 991-6116
Email: matt@sutterandterpak.com

*Local Counsel for Plaintiffs*

**ROWLEY LAW, PLLC**
Shane Rowley, Esq.
Danielle Rowland Lindahl, Esq.
50 Main Street, Suite 1000
White Plains, NY 10606
Telephone: (914) 400-1920
Facsimile: (914) 301-3514
Email: srowley@rowleylawpllc.com
drl@rowleylawpllc.com

**BRIAN MURRAY LAW PLLC**
Brian P. Murray
750 E. Main Street, Suite 620
Stamford, CT 06902
Telephone: (203) 246-2368
bmurray@brianmurraylaw.com